UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

GERALD CONLEY,                          )
                                        )
                    *Plaintiff*,        )
                                        )
        v.                              )        No. 1:19-cv-03164-JMS-MPB
                                        )
WINDOWS, LLC OF INDIANA A/K/A RENEWAL BY )
ANDERSEN, DAVIDSON GROUP, AND RENEWAL BY )
ANDERSEN LLC,                           )
                                        )
                    *Defendant*.        )

## ORDER

Plaintiff Gerald Conley, who is African American, worked for Defendant Windows, LLC of Indiana (also known as Renewal by Andersen, Davidson Group, and Renewal by Andersen LLC) ("Davidson Group"), as a Marketing/Revisit Manager from 2017 to 2018. On July 29, 2019, Mr. Conley initiated this litigation against Davidson Group for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") and race discrimination under 42 U.S.C. § 1981 related to certain events during his employment and, ultimately, his termination. Davidson Group has filed a Motion for Summary Judgment, which is now ripe for the Court's decision. [Filing No. 49.]

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted

fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the granting of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. Hampton v. Ford Motor Co., 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. Harper v. Vigilant Ins. Co., 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. Nelson v. Miller, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Darst v. Interstate Brands Corp., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that

they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.      Davidson Group Hires Mr. Conley as a Call Center Representative

Davidson Group is the Indiana distributor for Renewal by Andersen products, and sells and replaces residential windows and patio doors. [Filing No. 50-1 at 37; Filing No. 50-3 at 1.] During the relevant time period, Davidson Group had approximately 52 employees at its Indianapolis location, about 25% of whom were African American individuals. [Filing No. 50-3 at 2.]

Mr. Conley began his employment with Davidson Group on June 19, 2017, as a Call Center Representative. [Filing No. 50-1 at 4.] He had previously worked as a call center manager for Unique Home Solutions and as a call center assistant director for Bee Windows, and had significant sales and marketing experience. [Filing No. 60-1 at 1; Filing No. 60-2 at 3-4.][1] Mr. Conley was

---

[1] The Court's Practices and Procedures clearly set forth in Appendix A how to cite to exhibits in a brief. [Filing No. 4 at 3-4.] Mr. Conley has not followed the Court's clear instruction, instead referring to exhibits by name or number, and citing to their actual page number or paragraph number, instead of the ECF page number. For example, Mr. Conley cited to material on ECF page 1 of his Declaration as "Declaration of Gerald Conley, ¶ 2." [Filing No. 59 at 3.] Instead, the citation should be "Filing No. 60-1 at 1," which corresponds to the ECF number of the document,

one of 27 employees in Davidson Group's Indianapolis call center, and about 40% of the call center employees were African American individuals at that time.  [Filing No. 50-1 at 37; Filing No. 50-3 at 2.]  Throughout his employment, Mr. Conley understood that he was an at-will employee. [Filing No. 50-1 at 5-6; Filing No. 50-2 at 45.]

### B.      Davidson Group's Policies

When he was hired, Mr. Conley received a copy of Davidson Group's employee handbook ("the Handbook"), which he signed electronically.  [Filing No. 50-1 at 6; Filing No. 50-2 at 45.] The Handbook prohibits race discrimination and retaliation, along with other forms of unlawful discrimination.  [Filing No. 50-1 at 6; Filing No. 50-2 at 11.]  It also provides that any employee subjected to discrimination should immediately report issues to his or her manager or supervisor. [Filing No. 50-1 at 6; Filing No. 50-2 at 11.]  Further, the Handbook includes a personal leave policy that allows employees who have been employed for more than one year to obtain a leave of absence but also provides that "[r]eturn to work from a personal leave is not guaranteed, but rather is on a position available basis." [Filing No. 50-2 at 40.]

Davidson Group also has an attendance policy ("the Attendance Policy"), which provides that unexcused absences and other attendance issues (*e.g.*, tardiness, leaving early, and extended breaks) result in occurrences which are assigned various levels of points.  [Filing No. 50-1 at 7; Filing No. 50-2 at 46-50.]  Mr. Conley signed and acknowledged his receipt of the Attendance Policy.  [Filing No. 50-1 at 7; Filing No. 50-2 at 48-50.]

---

and the ECF page number where the cited material appears.  Mr. Conley's failure to provide the proper form of citation the Court specifically set forth in its Practices and Procedures made the Court's review of the pending motion unnecessarily cumbersome.  Counsel is cautioned to comply with the Court's Practices and Procedures going forward in this and other cases.

### C.    Mr. Conley's Promotion to Revisit Specialist

During his employment, Mr. Conley was promoted from Call Center Representative to Revisit Specialist.  [Filing No. 50-1 at 4.]  As a Revisit Specialist, Mr. Conley contacted customer leads who had already received a quote from Davidson Group but had not yet contracted for the work to be done, and attempted to convince the customer to commit to another appointment or a sale.  [Filing No. 50-1 at 4.]  In his position as Revisit Specialist, Mr. Conley reported directly to the Call Center Director.  [Filing No. 50-1 at 4-5.]  Mr. Conley was paid an hourly rate plus commission based upon sales that closed after he scheduled the appointment with the customer. [Filing No. 50-1 at 5.]

Mr. Conley generated millions of dollars in net revisit sales revenue in his position at Davidson Group.  [Filing No. 60-1 at 2.]  Davidson Group had cycled through other Revisit Specialists before Mr. Conley was promoted, and they generated between $75,000 and $100,000 in sales.  [Filing No. 60-1 at 2; Filing No. 60-2 at 9.]  During his 14 months as a Revisit Specialist for Davidson Group, Mr. Conley generated $4.2 million in net revisit sales revenue.  [Filing No. 60-1 at 2; Filing No. 60-2 at 9.]  In one five-month period as a Revisit Specialist, Mr. Conley generated $1 million in net revisit sales revenue.  [Filing No. 60-1 at 2; Filing No. 60-6 at 2-3.]

### D.    Davidson Group's Use of Software to Store Revisit Specialist Information

Davidson Group uses software called Enabled to store lead information, customer information, and employee notes.  [Filing No. 50-1 at 8; Filing No. 50-1 at 14.]  Mr. Conley had access to Enabled as a Revisit Specialist.  [Filing No. 50-1 at 8.]  Additionally, Davidson Group uses RingCentral, a program which records phone calls and stores the recordings in a database called Media Vault.  [Filing No. 50-1 at 14.]  When an employee calls a customer lead, the call is

manually entered by the employee into Enabled along with the employee's notes, the phone call is recorded in RingCentral, and the recording is saved in Media Vault. [Filing No. 50-1 at 14.]

### E.    Davidson Group Amends the Commission Plan for Revisit Specialists

In February 2018, Vice President of Sales Steve Woodward told Call Center Director Michelle Akers that Davidson Group's owner Stephen Davidson, who is Caucasian, was upset about the amount of commission that Mr. Conley was making, and wanted Mr. Conley's commission to be reduced. [Filing No. 60-5 at 1-2.] Shortly thereafter, Ms. Akers met with Mr. Conley and told him that she had been directed to cut his pay, but did not tell him that the commission plan was being changed. [Filing No. 60-1 at 3; Filing No. 60-2 at 11-12.] Mr. Conley asked why his pay was being cut, and Ms. Akers told him that the pay cut did not make sense and that "I feel you work for every penny that you make." [Filing No. 60-2 at 11-12.]

Davidson Group changed the commission plan for Revisit Specialists from 3.5 percent to 2.25 percent of net sales. [Filing No. 50-1 at 10; Filing No. 50-2 at 51-52.] Additionally, the commission plan was amended so that to be eligible for a bonus on an order: (1) the most recent appointment on the lead had to result in a demonstration, but no sale; (2) the lead had to be rescheduled in the Revisit Specialist's name; and (3) a disposition and notes had to be recorded reflecting that the Revisit Specialist added value to the lead by drawing the homeowner back to using the company. [Filing No. 50-1 at 38.] As a result, if the Revisit Specialist was not directly involved in setting the appointment that led to a purchase contract, no commission would be earned on that sale. [Filing No. 50-1 at 38.]

Prior to the commission plan change, Mr. Conley was paid an hourly wage rate of $15.00 and a 3.5% commission bonus on all net revisit sales that he generated after he reached the top level bonus of approximately $150,000 in monthly revisit sales, which he reached every month.

[Filing No. 60-1 at 2; Filing No. 60-2 at 12.]  After the commission plan change, Mr. Conley was only entitled to receive 1% of all revenue generated between $1.00 and $100,000; 1.5% of all revenue generated between $100,001 and $200,000; 1.75% of all revenue generated between $200,001 and $300,000; 2% of all revenue generated between $300,001 and $400,000; and 2.25% of all revenue generated over $400,001.  [Filing No. 50-2 at 51; Filing No. 60-2 at 12-13.]  To try to compensate for the change in the commission plan, Davidson Group raised Mr. Conley's base pay from $15 per hour to $17 per hour.  [Filing No. 50-1 at 10.]  Mr. Conley still incurred a 40% pay cut, and lost thousands of dollars each month in commission earnings.  [Filing No. 60-1 at 3-4; Filing No. 60-2 at 12.]

From the time that Mr. Conley was promoted to Revisit Specialist through February 2018, Mr. Conley was the only Revisit Specialist at Davidson Group.  [Filing No. 60-1 at 4; Filing No. 60-2 at 6.]  In February 2018, Davidson Group promoted Jason Still, who is Caucasian, to a Marketing Manager position within the Revisit Program.  [Filing No. 60-1 at 4; Filing No. 60-2 at 6; Filing No. 60-3 at 1.]  Mr. Still was the only other Davidson Group employee who worked with Mr. Conley on revisits, and the two sat next to each other and worked closely together.  [Filing No. 60-2 at 6; Filing No. 60-3 at 1-2.]  Mr. Still was also subject to the new commission plan.  [Filing No. 50-1 at 12; Filing No. 50-3 at 2.]  However, Mr. Still was never told that his pay had to be reduced, and he began making more money in February 2018 than he previously had, due to his promotion to Marketing Manager.  [Filing No. 60-1 at 4; Filing No. 60-3 at 3.]  Mr. Conley acknowledged that Davidson Group was free to change the commission plan at any time since he was an at-will employee.  [Filing No. 50-1 at 21.]

A few days after Mr. Conley's pay was cut, Mr. Davidson asked Ms. Akers how her conversation with Mr. Conley regarding the pay cut had gone.  [Filing No. 60-5 at 2.]  Ms. Akers

told Mr. Davidson that Mr. Conley was not happy, and Mr. Davidson told her "He won't leave. Nobody will hire him with that gold shit in his mouth." [Filing No. 60-5 at 2.] Mr. Conley has a gold front tooth, and felt that Mr. Davidson's comment related to Mr. Conley's race. [Filing No. 60-1 at 1; Filing No. 60-5 at 2.] Ms. Akers had not heard Mr. Davidson make a similar comment about any employee who was not African American. [Filing No. 60-5 at 2.][2]

### F. Mr. Conley Believes Data Related to His Customer Contacts Was Deleted

Mr. Conley's entries into Enabled memorialized the work that he performed when he called sales leads and scheduled revisit appointments. [Filing No. 60-1 at 4; Filing No. 60-3 at 3.] Enabled entries include a "history" section, which showed that an employee had contacted the customer lead to schedule an appointment and allowed for the posting of notes. [Filing No. 60-1 at 4.] Mr. Conley's Enabled entries memorialized his work, showed that he had worked on revisit sales leads, and were the main determiner of whether he would receive commission bonuses for revisit sales that he helped generate. [Filing No. 60-1 at 5; Filing No. 60-3 at 3.] Information in Enabled was only supposed to be removed or deleted when two files were created for the same potential customer. [Filing No. 60-6 at 4.] Mr. Conley also documented his revisit sales calls on written production tracker sheets, which identified revisit appointments that he had set for revisit sales leads. [Filing No. 60-2 at 15-18; Filing No. 60-3 at 3.]

In May 2018, after returning from vacation, Mr. Conley believed that many of his Enabled entries had been deleted because Davidson Group's appointment calendar showed that many

---

[2] In her Declaration, Ms. Akers details incidents involving other African American employees at Davidson Group. [See, e.g., Filing No. 60-5 at 1 (Ms. Akers stating that, after seeing two African American employees talking loudly to each other, Mr. Davidson advised Ms. Akers to take care of the issue because the company did not need "'loud Black women running around' the facility").] While reprehensible, this statement is too attenuated to create a material issue of fact on Mr. Conley's claims in this litigation – which are focused only on Davidson Group's treatment of him and do not include a hostile work environment claim.

potential customers that he had worked with were scheduled for revisit appointments that Mr. Conley had not yet set.  [Filing No. 60-1 at 5.]  The revisit appointments had either been set by Mr. Still or, against Davidson Group protocol, by call center representatives.  [Filing No. 60-1 at 5.]  If Mr. Conley's notes had not been deleted, either Mr. Still or the call center representatives should have refrained from setting appointments because they would have seen Mr. Conley's Enabled entries indicating that he was working with the potential customers.  [Filing No. 60-1 at 5.]

On May 16, 2018, Mr. Conley emailed Justin Terrasi, Davidson Group's Quality Assurance Manager, regarding his belief that some notes and information he had entered into Enabled were missing.  [Filing No. 50-1 at 12.]  Mr. Terrasi responded: "Gerald, I looked into the first couple.  I just spoke with [the new Call Center Director Laurin Wright] and anymore she said to send to her. Have you only noticed it in Indy?  any other markets?"  [Filing No. 50-2 at 53.]  Mr. Conley replied:

> That's the whole point I'm trying to prove somebody deleted all my info from the files and I haven't even made it to the other markets there's so many [deleted entries] in [I]ndy.  Did you ask Laurin if she's having the callers delete my files or the old files?

[Filing No. 50-2 at 53.]

That same day, Ms. Wright emailed Mr. Conley, stating:

> I have heard from both [Mr. Terrasi] and [Mr. Woodward] this morning about you calling them to talk about your leads.  I have not received a call.
>
> I got the same message from both [Mr. Woodward] and [Mr. Terrasi] that the leads you are claiming to have been working with are new leads that have no record of you ever being in contact with the HO.
>
> Please send me a list of leads you are disputing so I can look into them.

[Filing No. 50-3 at 9.]  Mr. Conley responded:

Laurin I'm so upset right now we can just talk tomorrow.  Look local the 16th thru the 20th every lead literally is a past lead of mine, Yet there is no longer any record and [Mr. Terrasi] says the calls are missing it makes no sense for all my info to be gone.  I understand they're calling PC's but my info still should be there and how in the world are the calls coming up missing.  I just sent [Mr. Terrasi] a list of 20 Revisits that should be upsales have him forward them to you because this is crazy.

[Filing No. 50-3 at 9.]

Ms. Wright initially asked Mr. Terrasi to investigate Mr. Conley's complaints, but when Mr. Conley continued to raise concerns, Ms. Wright investigated the complaints as well.  [Filing No. 50-3 at 2.] As part of her investigation, Ms. Wright reviewed the data in Enabled, RingCentral, and Media Vault to determine whether that data supported or undermined Mr. Conley's claims. [Filing No. 50-3 at 3.]  Ms. Wright directed Mr. Terrasi to call customers to determine whether Mr. Conley had communicated with them, and Ms. Wright spoke with other employees to determine whether they were aware of any notes being deleted from the system.  [Filing No. 50-3 at 3; Filing No. 50-3 at 12-16.]  Additionally, Ms. Wright determined that there was no record of any phone calls to the leads that Mr. Conley had identified in RingCentral or Media Vault.  [Filing No. 50-3 at 3.]  Ms. Wright also identified the customers for which there was data for Mr. Conley's contacts, and determined whether notes had been deleted from those accounts.  [Filing No. 50-3 at 3.]  She discovered that in every instance for which there was a recorded phone call, there were also notes in Enabled.  [Filing No. 50-3 at 3.]  Further, phone calls to customers and conversations with other employees confirmed her findings.  [Filing No. 50-3 at 3.]  In short, Ms. Wright did not find any evidence during her investigation indicating that notes and information that Mr. Conley had inputted had been deleted.  [Filing No. 50-3 at 3; Filing No. 50-3 at 17-27.]  Ms. Wright and Mr. Woodward forwarded the results of their investigation to Mr. Conley, and explained that they had not found any evidence supporting his allegations.  [Filing No. 50-1 at 19-20; Filing No. 50-3 at 12-16.]

10

In a May 23, 2018 email exchange between Mr. Conley and Mr. Terrasi, Mr. Terrasi confirmed that one of Mr. Conley's Enabled entries had no information in the "history" section of the Enabled customer lead that showed that Mr. Conley had contacted the customer, scheduled a revisit appointment, and posted notes. [Filing No. 60-2 at 25; Filing No. 60-6 at 6.] Mr. Terrasi found this "very odd," and he did not know "what would cause that." [Filing No. 60-6 at 6.] The missing information was the information used to determine whether Mr. Conley made a commission on the sale. [Filing No. 60-1 at 5.]

On June 11, 2018, Mr. Conley emailed Mr. Woodward and Ms. Wright regarding, among other things, a customer account from Michigan for which he felt he should have been paid commissions because the appointment he set with the customer had been rescheduled by another representative. [Filing No. 50-2 at 56.] He wrote:

> I set a revisit in Michigan for a fri, Johnathon Koch calls and resets the lead himself for the following Friday, however when the confo-dept calls to confo he ran the lead the day before and never called the demo in and then sold it 3 days later! I remember the lead and emailed Justin.

[Filing No. 50-2 at 56.] Mr. Woodward responded the same day, stating:

> Feel free to show [Ms. Wright] the details on the Jon Koch lead. If you were working this lead recently and the lead got reset a few times by different reps, I have no problem paying for it. Just like I have agreed to in the past. For future leads, you know my stance.

[Filing No. 50-2 at 55.] Mr. Conley later was paid for this lead, and for two other leads where another sales representative had reset an appointment. [Filing No. 50-1 at 20.]

Mr. Conley continued to notice discrepancies with his Enabled entries, and had persistent problems with the issue. [Filing No. 60-1 at 6; Filing No. 60-3 at 3.] Mr. Still never had issues with deleted entries. [Filing No. 60-3 at 4.] Mr. Conley also continued to experience instances

when he was not paid sales commission that he had earned, and he raised these issues with Ms. Wright but she failed to address them. [Filing No. 60-1 at 6.]

On June 12, 2018, Mr. Conley emailed Mr. Terrasi and Ms. Wright about another account for which he believed he should have been paid commission because he established the original contact with the customer, even though another representative closed the sale. [Filing No. 50-1 at 23; Filing No. 50-2 at 59.] Ms. Wright explained to Mr. Conley that according to the updates to the commission plan, he did not earn commission when another employee set the ultimate appointment that led to the sale. [Filing No. 50-2 at 58-59.] Mr. Conley reiterated that he had entered yellow box notes for the customer in Enabled and that his notes had been erased. [Filing No. 50-2 at 58-59.] The notes could have established that Mr. Conley was entitled to commission on the sale. [Filing No. 50-2 at 58-59.] Ms. Wright never addressed Mr. Conley's concern about his notes and he was never paid commission. [Filing No. 60-2 at 19.] Mr. Conley requested that he and Ms. Wright meet to discuss these issues, but Ms. Wright refused. [Filing No. 60-1 at 5-7; Filing No. 60-2 at 19.] Ms. Wright told Mr. Conley "I don't know what you are complaining for. I'm the Director and you make more money than me." [Filing No. 60-1 at 7.] Ms. Wright made that comment to Mr. Conley on several occasions when he complained about the deleted entries and unpaid commissions, and also told Mr. Conley that he was "well-compensated" for the job that he was doing. [Filing No. 60-1 at 7.] She did not make similar comments to Mr. Still. [Filing No. 60-3 at 5.]

Mr. Conley also discussed the Enabled entries that he believed had been deleted with Mr. Still. [Filing No. 60-3 at 3.] Mr. Still remembered that when he and Mr. Conley worked together, Mr. Conley seemed to have constant issues with entries being deleted. [Filing No. 60-3 at 3.] On one occasion, Mr. Still was working on a lead and Mr. Conley recognized the customer as one that

Mr. Conley had previously called.  [Filing No. 60-3 at 3-4.]  Mr. Still would not have called the customer had the Enabled entry reflected that Mr. Conley had  been working on the lead but, because there was no information in Enabled indicating that Mr. Conley had made a previous contact, Mr. Still called the customer.  [Filing No. 60-3 at 3-4.]  Mr. Conley advised Mr. Still to take credit for the customer sale since the information indicating that Mr. Conley was working on the lead did not appear in Enabled.  [Filing No. 60-3 at 3-4.]

Mr. Conley believed that the issues with deleted entries may have extended as far back as to the beginning of his employment, but Ms. Wright only checked Enabled entries for a limited number of customers over a short period of time in May 2018.  [Filing No. 60-1 at 5-6.]  Mr. Conley does not know of anyone with a motive to delete records related to his leads, but felt that the information was deleted because of his race "[b]ecause this was not happening to no one else in the building."  [Filing No. 50-1 at 33.]

### G.   Lack of Complaints About Race Discrimination

Mr. Conley testified in his deposition that when he complained to management about the information that he believed had been deleted, he never reported that he was concerned the deletions were happening because of his race.  [Filing No. 50-1 at 31.]  Additionally, Mr. Conley did not report any complaints about race discrimination to Call Center management.  [Filing No. 50-1 at 31.]  Mr. Conley also never reported any alleged race discrimination to human resources, nor did he speak with anyone at Davidson Group about its equal opportunity/anti-discrimination policy.  [Filing No. 50-1 at 6; Filing No. 50-2 at 11.]

### H.   Mr. Conley's Failure to Follow the Chain of Command

On August 3, 2018, Mr. Conley emailed Mr. Woodward and requested a meeting to discuss "several issues" he had been having.  [Filing No. 50-2 at 60-61.]  He wanted to meet with Mr.

Woodward, who was one of Ms. Wright's supervisors, because Ms. Wright had failed to address the deletions of information. [Filing No. 60-1 at 7.] Mr. Conley stated that he had left Ms. Wright a voicemail to discuss the issues, but she had not returned his call, that Ms. Wright had said she was too busy to talk during her shift, that he knew "this is not following proper chain of command but honestly my remedy would come from you," and that he was only reaching out to Mr. Woodward as a "last resort." [Filing No. 50-2 at 60-61.] Mr. Woodward responded that he was busy until the following Thursday, and encouraged Mr. Conley to "continue to try to work with [Ms. Wright] as well," because "[a]t the end of the day, these issues should be resolved whenever possible with your direct manager." [Filing No. 50-2 at 60.] Mr. Woodward told Mr. Conley that he would remind Ms. Wright that she needed to make time to discuss the issues with Mr. Conley. [Filing No. 50-2 at 60.]

The Handbook included a "Job-Related Problem Solving" section with a "Conflict Resolution" subsection. [Filing No. 50-2 at 42.] The "Conflict Resolution" subsection set forth a suggested process for resolving problems between co-workers: the first step advised the employee to schedule a discussion for "all parties involved," and provided "If you do not feel comfortable in resolving the conflict yourself, then seek the assistance of your supervisor or any manager." [Filing No. 50-2 at 42; Filing No. 60-1 at 7.]

Mr. Conley sent an email, titled "Conflict resolution meeting," to Mr. Woodward on August 22, 2018, copying Ms. Wright, and requested a conflict resolution meeting, noting "I have examples of everything I have an issue with…." [Filing No. 50-2 at 63.] Mr. Conley believed that he had a conflict with Ms. Wright that needed to be addressed with Mr. Woodward's assistance. [Filing No. 50-2 at 62-63; Filing No. 60-2 at 27-28.] Mr. Woodward responded:

> You need to find a way to work through your issues with [Ms. Wright]. If you can't do that, it's time to part ways. She is a great manager and she is fair. Most

14

importantly, we are aligned on how we do things.  I support [her] 100%.  I am not trying to pass the buck either.  It's about respect.  [Ms. Wright] deserves your respect and she will be fair.  If she isn't 100% sure then she will come to me.  Again, this isn't about me being above this topic.  I like being involved but I also have many things that need to get done for us to do what we do.

In summary, we are completely fair and we provide an amazing financial opportunity for you.  It's time to work with [Ms. Wright] to grow the Revisit program.  If you can't form a team and work with your manager, it's time to move in a different direction.

[Filing No. 50-2 at 62.]  Mr. Woodward copied Ms. Wright on his response, and asked her to

"[p]lease get with [Mr. Conley] and try to help."  [Filing No. 50-2 at 62.]

On August 23, 2018, Mr. Conley was given a Final Written Warning under Davidson

Group's Corrective Action Plan, which stated:

[Insubordination]: On 8/21/18, [Mr. Conley] sent an email to Steve Woodward [to] request a meeting, and explained that he was extremely unhappy with the current state of the revisit program.  [Mr. Conley] has been informed previously that when he has an issue of any kind, he is to come to [Ms. Wright], who is his direct supervisor.  [Mr. Conley] has made insinuating comments saying things like he has been doing this a long time and that he knows more than some managers.

[Ms. Wright] feels that [Mr. Conley] is disrespecting her because of her age and her gender.  [Mr. Conley] has no issue voicing his issues/concerns to other older, male, managers, including [Mr.] Terrasi, [Mr.] Woodward, and James (Jim) Gresham.

*               *               *

If [Mr. Conley] is insubordinate any further, by going to other members of management other than [Ms. Wright], he will be terminated.

[Filing No. 50-3 at 28.]  The blank for employee signature states "Refused to sign."  [Filing No. 50-3 at 28.]

Ruth Mills was a Caucasian employee in another department at Davidson Group, and was

issued a Final Written Warning under Davidson Group's Corrective Action Plan after she violated

15

company policy by failing to notify a design consultant that a customer had cancelled an appointment and the design consultant went to the cancelled appointment. [Filing No. 50-3 at 32.]

## I.    Mr. Conley's Attendance Issues

Under the Attendance Policy, employees received attendance "points" or "occurrences" for unexcused absences and tardies. [Filing No. 50-2 at 46-50; Filing No. 60-1 at 8.] Employees who accrued 9 unexcused attendance points/occurrences were subject to termination. [Filing No. 50-2 at 46-50; Filing No. 60-1 at 8.] Ms. Wright was responsible for administering Davidson Group's Attendance Policy for Call Center employees like Mr. Conley and for employees who worked in the Confirmation Department, which was part of the Call Center. [Filing No. 60-1 at 8-9; Filing No. 60-2 at 35; Filing No. 60-3 at 4.]

Mr. Conley would frequently be stopped by sales representatives, front office workers, and supervisors to have work-related discussions before he arrived to work or between his breaks. [Filing No. 60-1 at 8; Filing No. 60-2 at 29.] These work-related discussions would sometimes slow him down and he would not arrive on time or return on time to his desk after a break. [Filing No. 60-1 at 8; Filing No. 60-2 at 29.] From July 31, 2018 to October 3, 2018, Mr. Conley had four unexcused absences, was late for work eleven times, and took one unauthorized extended lunch period. [Filing No. 50-3 at 4; Filing No. 50-3 at 29-30.] As a result, and pursuant to Davidson Group's Attendance Policy, Mr. Conley was issued a Verbal Warning on September 13, 2018, a Written Warning on September 25, 2018, and a Final Written Warning on October 4, 2018. [Filing No. 50-1 at 28; Filing No. 50-3 at 4-5; Filing No. 50-3 at 29-30.] When the Final Written Warning was issued on October 4, 2018, Mr. Conley had accumulated more than seven occurrences. [Filing No. 50-1 at 27; Filing No. 50-3 at 5; Filing No. 50-3 at 29.] The October 4, 2018 Final Written Warning was issued after Mr. Conley was one minute late the day before. [Filing No. 60-6 at 9.]

Mr. Conley had not previously been disciplined for minor tardies, but Ms. Wright began issuing discipline to Mr. Conley under the Attendance Policy in September and October 2018. [Filing No. 60-1 at 9; Filing No. 60-6 at 9-10.]

Ms. Mills, who is Caucasian, missed several days of work and Mr. Conley speculated that her absences should have added up to a sufficient number of attendance points to warrant termination. [Filing No. 50-1 at 34-35.] While Ms. Mills did miss several days of work, each of her absences was recorded as an occurrence pursuant to Davidson Group's attendance policy. [Filing No. 50-3 at 5; Filing No. 50-3 at 31.] Additionally, Ms. Mills received a documented warning for attendance violations, after which her attendance issues improved so no further disciplinary action was needed. [Filing No. 50-3 at 5; Filing No. 50-3 at 31.] Mr. Conley believes that Ms. Mills should have been "pointed out" by surpassing the maximum number of points allowed under the Attendance Policy and that she should have been terminated by Ms. Wright. [Filing No. 60-1 at 9.] But Ms. Wright did not terminate Ms. Mills for violating the Attendance Policy during Mr. Conley's employment at Davidson Group. [Filing No. 60-1 at 9.]

Mr. Still did not receive attendance points for being a few minutes late, but Mr. Still's attendance issues did not rise to the level of formal disciplinary action under the attendance policy. [Filing No. 50-1 at 35; Filing No. 50-3 at 5.]

### J.    Mr. Conley's Leave of Absence and Termination

On October 4, 2018, Mr. Conley emailed Ms. Wright to request paid time off from October 5, 2018 to November 1, 2018. [Filing No. 50-3 at 35.] Ms. Wright responded to Mr. Conley that his request was denied because he only had 2 hours and 19 minutes of paid time off available. [Filing No. 50-3 at 35.] Mr. Conley then changed his request to one for unpaid leave, and changed the dates of leave from October 5, 2018 to November 20, 2018. [Filing No. 50-1 at 28-29; Filing

No. 50-3 at 33.] Ms. Wright checked with Mr. Davison, and granted Mr. Conley's request. [Filing No. 50-3 at 5.] She informed him in an email, however, that "we will have to fill your position while you are gone. With that being the case, your current position may not be available on your return." [Filing No. 50-3 at 5-6; Filing No. 50-3 at 34.] Mr. Conley received Ms. Wright's email with this warning, and confirmed his understanding that his position might not be available upon his return. [Filing No. 50-3 at 33.] He advised Ms. Wright that he was not resigning. [Filing No. 50-3 at 33.]

On October 25, 2018, Ms. Wright called Mr. Conley and left him a voicemail informing him that his position had been filled, so his employment was being terminated that day. [Filing No. 50-1 at 30; Filing No. 50-2 at 64-65.] Mr. Conley did not receive Ms. Wright's voicemail, but acknowledged that Ms. Wright may have made the call and, upon hearing a recording of the voicemail message, agreed that the message was left in his voicemail inbox and that he had no reason to dispute that the voicemail was left. [Filing No. 50-1 at 30.] Ms. Wright completed a Termination Report for Mr. Conley, stating that he was involuntarily terminated because Davidson Group had filled his position and that it did not have an open position for him. [Filing No. 60-6 at 14.]

On November 19, 2018, having not heard Ms. Wright's voicemail message, Mr. Conley emailed Ms. Wright regarding his intention to return to work at Davidson Group the following day. [Filing No. 50-1 at 35-36; Filing No. 50-2 at 68.] Ms. Wright emailed Mr. Conley back that same day, and informed Mr. Conley that his position had been filled by someone else and his employment had been terminated. [Filing No. 50-2 at 68.] Mr. Conley did not learn that he had been terminated until he received Ms. Wright's November 19, 2018 email. [Filing No. 60-1 at 11; Filing No. 60-2 at 36.]

### K.      Mr. Conley's Replacement

Davidson Group hired a Caucasian male to replace Mr. Conley.  [Filing No. 60-3 at 5.]

That individual worked closely with Mr. Still, and Mr. Still is familiar with the individual's sales

record, which was not nearly as strong as Mr. Conley's.  [Filing No. 60-3 at 5.]

### L.      The EEOC Charge and the Lawsuit

On November 19, 2018, after Mr. Conley's employment had been terminated but before he

knew that was the case, Mr. Conley filed a Charge with the Equal Employment Opportunity

Commission ("EEOC").  [Filing No. 50-1 at 30; Filing No. 50-2 at 66-67.]  In the Charge, Mr.

Conley alleged race discrimination and retaliation based on continuing action, and set forth his

allegations regarding the entries he believed had been deleted from the computer system and his

concerns regarding not receiving wages, bonuses, and commissions to which he felt he was

entitled.  [Filing No. 50-2 at 66-67.]  The EEOC issued a Right to Sue Letter on April 3, 2019,

[Filing No. 50-2 at 69], and Mr. Conley initiated this litigation on July 29, 2019, [Filing No. 1].

In his Complaint, Mr. Conley sets forth claims for race discrimination under Title VII and § 1981,

and retaliation under Title VII.  [Filing No. 1.]

### III.
#### DISCUSSION

### A.      Title VII and § 1981 Race Discrimination Claims

Mr. Conley bases his race discrimination claims on four alleged actions by Davidson

Group: (1) revising the commission plan, which resulted in a pay cut; (2) deleting information

related to his sales; (3) disciplining him for insubordination and attendance issues; and (4)

terminating him.  The Court first sets forth the law applicable to Mr. Conley's race discrimination

claims, and then addresses each of his theories in turn.

1.      *Applicable Law*

Title VII of the Civil Rights Act of 1964 forbids an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."  The analysis of a Title VII claim and a Section 1981 claim are the same, and cases discussing claims under either provision are instructive.  *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013) ("The substantive standards and methods that apply to Title VII also apply to 42 U.S.C. § 1981").  "[T]he singular question that matters in a discrimination case [is]: '[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the…adverse employment action,'" *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)), and a plaintiff must provide such evidence in order to survive summary judgment, *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017).

A plaintiff may rely on both direct and circumstantial evidence to support an inference of causation and intent.  *Joll v. Valparaiso Comm. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020).  A plaintiff can also "enlist the burden-shifting framework of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]" "[t]o clarify and to simplify [his] task." *Joll*, 953 F.3d at 929 (quotation

and citation omitted).  The Court's focus is to "consider[ ] [the evidence] as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of Chief Judge of Cook Cnty., Ill.*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).  In determining whether the evidence would permit a reasonable factfinder to conclude that Mr. Conley's race caused him to be treated unfairly, "the burden-shifting framework of *McDonnell Douglas* remains relevant as a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Owens v. Old Wis. Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017) (quotation and citation omitted).  But the Court "review[s] the evidence holistically to see if it permits an inference of race discrimination." *Lloyd v. Mayor of City of Peru*, 761 Fed. App'x 608, 610 (7th Cir. 2019).  "[A]ll evidence belongs in a single pile and must be evaluated as a whole." *Igasaki v. Ill. Dept. of Fin. & Prof. Reg.*, 988 F.3d 948, 957 (7th Cir. 2021) (citation and quotation omitted).

Under the *McDonnell Douglas* framework, a plaintiff must "make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 601-02 (7th Cir. 2020).  To make a prima facie case under *McDonnell Douglas*, a plaintiff must show: (1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer. *Marshall v. Indiana Dep't of Corr.*, 973 F.3d 789, 791-92 (7th Cir. 2020).

2.    *Changes to Commission Plan*

Davidson Group argues in support of its Motion for Summary Judgment that Mr. Conley's race discrimination claims based on changes to the commission plan fail because he has not produced evidence of a similarly situated comparator who was treated more favorably than him. [Filing No. 51 at 14.] It notes that Mr. Conley conceded that, as an at-will employer, Davidson Group could amend the commission plan at any time. [Filing No. 51 at 15.] Further, Davidson Group argues that Mr. Still was subject to the same commission plan to which Mr. Conley was subject. [Filing No. 51 at 15.] Davidson Group also asserts that Mr. Conley has not provided any evidence indicating that amending the commission plan had anything to do with race. [Filing No. 51 at 15.]

In response, Mr. Conley argues that he "was a fantastic salesperson who rejuvenated the Company's struggling Revisit Program by generating millions in net revisit sales revenue for the Company." [Filing No. 59 at 29-30.] Mr. Conley contends that the timing of his pay cut was suspicious because he had been very successful in "revamping the Revisit Program and in generating new net revenue for the Company," Davidson Group was not in financial distress, and Mr. Davidson displayed anger when he learned how much Mr. Conley made, which "can reasonably [be] interpreted as reflecting animus toward [Mr.] Conley because he is African American." [Filing No. 59 at 30.] Mr. Conley points to Mr. Davidson's comment that "He won't leave. Nobody will hire him with that gold shit in his mouth," and notes that Ms. Wright never heard Mr. Davidson make a similar comment about a non-African American employee. [Filing No. 59 at 31.] Mr. Conley attempts to distinguish himself from Mr. Still by arguing that the new commission plan resulted in a pay cut for him but not for Mr. Still, who recently had been promoted and had received a pay raise. [Filing No. 59 at 30.] He also argues that Ms. Wright responded to

22

his complaints about the commission plan change by stating that she did not know why he was complaining because he was making more money than her, and that he was "well-compensated" for his work.  [Filing No. 59 at 31.]

In its reply, Davidson Group argues that Mr. Conley did not respond to its argument that he failed to make out a prima facie case of race discrimination because he did not present evidence of a similarly situated comparator.  [Filing No. 62 at 1.]  It asserts that Mr. Conley's arguments addressing pretext are unavailing because "there is simply no evidence of disparate treatment," and that Mr. Conley acknowledges that Mr. Still was paid according to the same commission plan. [Filing No. 62 at 3-4.]  Davidson Group contends that the fact that the new commission plan resulted in a pay cut for Mr. Conley and a pay raise for Mr. Still is irrelevant, because they did not become similarly situated until they held the same position – at which point they were subject to the same commission plan.  [Filing No. 62 at 4.]  Davidson Group argues that making payroll decisions that impact similarly situated employees the same way cannot support a claim of discrimination.  [Filing No. 62 at 4.]  It contends that Mr. Conley's argument regarding Mr. Davidson's gold tooth comment being related to race is "a highly speculative, conclusory leap," and that the comment was made after the new commission plan was put in place in any event. [Filing No. 62 at 5.]  Finally, Davidson Group argues that Ms. Wright's statements about Mr. Conley's pay had nothing to do with race.  [Filing No. 62 at 5-6.]

In connection with his discrimination claims based on changes to the commission plan, and the fact that it resulted in a pay cut for him, Mr. Conley has not set forth a prima facie case of discrimination because he has not shown that Davidson Group treated a similarly situated comparator outside of his protected class more favorably.  Indeed, Mr. Conley acknowledges that the comparator he points to, Mr. Still, was subject to the exact same commission plan to which he

was subject.  Mr. Conley argues that the new commission plan resulted in a pay cut for him, but in a pay raise for Mr. Still, who had just been promoted to the position of Marketing Manager within the Revisit Program.  But this comparison is irrelevant.  Mr. Still became similarly situated to  Mr. Conley when he was promoted – which was also the point when he and Mr. Conley became subject to the same commission plan.  The fact that Davidson Group treated Mr. Conley and his comparator, Mr. Still,  the same through application of the same commission plan is fatal to Mr. Conley's race discrimination claim based on changes to the commission plan.

In  addition  to  the  lack  of  evidence  that  Davidson Group  treated  a  similarly  situated individual outside of Mr. Conley's protected class more favorably with respect to the commission plan, Mr. Conley has not presented evidence that changing the commission plan was motivated by his race.  Mr. Conley points to comments by Mr. Davidson and Ms. Wright that Mr. Conley was making too much, that his pay needed to be reduced, and that he should be satisfied with his salary. But even assuming Davidson Group changed the commission plan specifically to decrease Mr. Conley's salary, this still does not link the decision to the fact that Mr. Conley is African American. This Court "does not act as a superpersonnel department." *Milligan-Grimstad*, 877 F.3d at 710 (internal quotation omitted).  Instead, it looks only to whether Davidson Group's decision to change the commission plan is supported by legitimate reasons, and not at whether it was the best or even fairest decision.  *See David v. Bd. of Trustees of Comm. Coll. Dist. No. 508*, 846 F.3d 216, 229 (7th Cir. 2017) ("Our role…is not to inquire into the wisdom of an employment decision, but simply to determine if the employer is dissembling to cover up a discriminatory purpose"); *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) ("[T]he only question is whether the employer's proffered reason [for the adverse employment action] was pretextual, meaning that it was a lie") (quotation and citation omitted); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th

Cir. 2006) ("[I]t is not our role to determine the competency of or interfere in employment decisions simply where we believe an employer has made a poor choice. Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair"). Even if Davidson Group changed the commission plan so that Mr. Conley would not make as much, it was entitled to do so as long as the decision was not motivated by Mr. Conley's race.

Mr. Conley points to a specific comment by Mr. Davidson, who asked Ms. Akers how things had gone with Mr. Conley regarding the changes to the commission plan and stated "He won't leave. Nobody will hire him with that gold shit in his mouth." [Filing No. 60-5 at 2.] Mr. Conley argues that this comment, referring to Mr. Conley's gold front tooth, implicates his race, and that Mr. Davidson had never made a similar comment about any employee who was not African American. [Filing No. 60-5 at 2.] But this comment does not explicitly refer to Mr. Conley's race and, even if it implied that Mr. Davidson was referring to the fact that Mr. Conley is African American, it is a single comment and is not sufficient to show that the decision to change the commission plan was motivated by race rather than a business decision.[3] Moreover, the comment was made after the commission plan had already been changed.

---

[3] Mr. Conley relies upon a case from the Court of Appeals of Georgia in which the court found that striking a potential juror in a criminal case because he had gold teeth in his "entire mouth" was not race neutral because that characteristic was a "cultural proxy stereotypically associated with African-Americans." *Clayton v. State*, 341 Ga. App. 193, 199-200 (Ga. Ct. App. 2017). This case is outside of the employment discrimination context, and is not binding on this Court in any event. Another case relied upon by Mr. Conley, *Harkless v. Sweeney Ind. Sch. Dist.*, 554 F.2d 1353, 1355 (5th Cir. 1977), involved a comment that plaintiff was a "real up-town, gold-toothed, yellow shod dude," and "numerous other references to race in a similar vein." These cases do not support the conclusion that Mr. Davidson's single comment, referencing only Mr. Conley's gold tooth, constitutes pretext for discrimination.

The Court **GRANTS** Davidson Group's Motion for Summary Judgment on Mr. Conley's discrimination claims related to changes in the commission plan which resulted in a pay cut.

### 3.    *Deletion of Sales Information*

In support of its Motion for Summary Judgment, Davidson Group argues that Mr. Conley has not set forth a prima facie case of race discrimination because there is no similarly situated Revisit Specialist who did not experience the same alleged problems. [Filing No. 51 at 15.] Specifically, Davidson Group argues that Mr. Conley's own deposition testimony indicates that Mr. Still also had issues with information being deleted. [Filing No. 51 at 15.] Davidson Group asserts that Mr. Conley has not linked the alleged deletion of information to his race, and that Ms. Wright thoroughly researched the issue of the missing information and was unable to confirm that any information was actually missing. [Filing No. 51 at 16.]

In response, Mr. Conley argues that Mr. Still did not testify that his sales information was deleted, but rather he stated that he was having similar issues to Mr. Conley because Davidson Group refused to pay him commission on a sale for which he had made the final phone call. [Filing No. 59 at 26-27.] Mr. Conley contends that Mr. Still's issues "had nothing to do with Enabled or the deletion of Enabled entries." [Filing No. 59 at 27.] Mr. Conley asserts that Mr. Still's deposition testimony actually "establishes that [Mr.] Still never had a problem with the deletion or modification of his Enabled entries," and that the fact that Mr. Still never had issues is prima face evidence of race discrimination. [Filing No. 59 at 27.] Finally, Mr. Conley argues that, at the least, there is a genuine issue of material fact regarding whether the entries were deleted. [Filing No. 59 at 28.]

In its reply, Davidson Group again contends that Mr. Conley's deposition testimony indicates that Mr. Still had issues with deleted information. [Filing No. 62 at 6.] It argues that,

even if Mr. Still had not experienced issues with deleted information, Mr. Conley has not established that the alleged deletions were related to race. [Filing No. 62 at 6.] Davidson Group notes that evidence that Mr. Still was similarly situated and treated differently – *i.e.*, that Mr. Still did not have issues with deleted entries – would only satisfy a prima facie element of his claim and is not evidence of pretext. [Filing No. 62 at 8.]

At the outset, the Court notes that there is a genuine issue of fact regarding whether Davidson Group deleted Mr. Conley's data entries. The Court must view the facts in the light most favorable to Mr. Conley, so it will assume for purposes of the Motion for Summary Judgment that the entries that Mr. Conley claims were missing were in fact deleted. This issue of fact, however, does not necessarily preclude summary judgment. The focus is on whether Mr. Conley has linked those deletions to his race.

As to whether Mr. Still is a sufficient comparator, the Court sets forth the following testimony from Mr. Conley's deposition:

> Q: So this is an email from Laurin Wright, October 18th, 2018. This is while you were on leave?
>
> A: Yes.
>
> Q: "Re: DNS," she says: "[Mr. Still], I will not be able to pay you on this lead. The phone call with the HO was 1:13 and there was no value added on this lead."
>
> A: Yes. And she actually turned around after [Mr. Still] had a blow-up in the office and paid him on that lead.
>
> Q: How do you know?
>
> A: Because [Mr. Still] told me.
>
> Q: So [Mr. Still] got upset about it and had a blow-up? What do you mean by a blow-up?
>
> A: He was starting to see the issues that I was, you know, saying for hisself because I was out of the office. So, you know, it became a reality for him once my leave

set in.  And so basically, it was a lead where he had talked to a few times, and his last call was only a minute and 13 seconds.  And she didn't want to pay him on it. Well, he had a meeting in the office with her.  And he told her that he – kind of just blew up on her and he ended up getting paid that same day.

Q:  So he was – it's your understanding he was beginning to experience similar problems as to what you were experiencing when you were there?

A:  Yes.  He was starting to see a lot of leads come through that were demo, no sales that were information was missing, they were missourced, so on and so forth.

[Filing No. 60-2 at 43.]

Even if Mr. Conley's testimony could be read to indicate that Mr. Still's data was also deleted, this is flatly contradicted by Mr. Still's Declaration, in which he unequivocally states that "[d]uring my entire employment with [Davidson Group], I never had any problems with the deletion or modification of my Enabled entries.  I also never had to complain to [Davidson Group] about the deletion or modification of my Enabled entries."  [Filing No. 60-3 at 4.]  Based on Mr. Still's Declaration, and again viewing the facts in the light most favorable to Mr. Conley, the Court concludes that Mr. Still did not have issues with the deletion of data as Mr. Conley did. Accordingly, Mr. Still is a sufficient comparator and Mr. Conley has set forth a prima facie case of race discrimination related to the deletion of data.

Davidson Group explains the decision not to pay Mr. Conley commissions based on the data he claims was deleted by insisting that the data was never deleted, and that Ms. Wright conducted a thorough review once Mr. Conley complained about the issue.  Mr. Conley's only attempt at showing that these reasons are pretextual is to again point to the fact that Mr. Still's entries were not deleted.  "A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 892 (7th Cir. 2001) (citation and

28

quotation omitted).  Here, however, the Court must recognize the undisputed evidence of Davidson Group's efforts to investigate Mr. Conley's claims that data had been deleted.  While Mr. Conley disputes the effectiveness or thoroughness of those efforts, it is undisputed that Ms. Wright did investigate Mr. Conley's claims and determined that Mr. Conley was not entitled to additional commissions because company records did not support his claim of missing data.  Even assuming, as the Court must, that the data was missing, Mr. Conley has not set forth any evidence that Davidson Group intentionally deleted the entries, and that the deletions and the resulting decision not to pay additional commissions were motivated by Mr. Conley's race.

Although Mr. Conley has set forth a prima facie case of race discrimination, Davidson Group responded with a race neutral explanation as to the adverse action, in response to which Mr. Conley has not provided evidence of pretext.  The Court **GRANTS** Davidson Group's Motion for Summary Judgment on Mr. Conley's race discrimination claim based on the deletion of data.

### 4.   *Discipline*

Mr. Conley asserts race discrimination claims related to receiving discipline for insubordination and for violating Davidson Group's attendance policy.  The Court considers each theory in turn.

### a.   Discipline for Insubordination

Davidson Group argues in support of its Motion for Summary Judgment that Mr. Conley cannot set forth a prima facie case of discrimination based on discipline for insubordination because he cannot show that he was performing his job satisfactorily.  [Filing No. 51 at 17.]  It contends that Mr. Conley disregarded directives from Mr. Woodward to address any concerns he had with Ms. Wright, and that Mr. Conley himself acknowledged that he was not following the proper chain of command.  [Filing No. 51 at 17.]  Davidson Group also argues that Mr. Conley

has not presented evidence of a similarly situated comparator that was treated more favorably than him.  [Filing No. 51 at 18.]

In response, Mr. Conley argues that "[w]hen a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge, allowing the plaintiff to establish a *prima facie* case by establishing that similarly situated employees were treated more favorably." [Filing No. 59 at 21.]  He asserts that Davidson Group effectively concedes that he and Ms. Mills  are similarly situated, and that there is a genuine issue of material fact as to whether he was disciplined more harshly than Ms. Mills.  [Filing No. 59 at 22.]

In its reply, Davidson Group argues that Ms. Mills is not similarly situated for Mr. Conley's claims related to discipline for insubordination because she was disciplined for dissimilar conduct.  [Filing No. 62 at 8-9.]  It notes that, while the two do not need to have violated the same rules, "[c]omparing job performance for forgetting to inform a [consultant] of an appointment cancellation to insubordination is like comparing apples to oranges and does not satisfy the similarly situated comparator *prima facie* element."  [Filing No. 62 at 9.]  Davidson Group also notes that Mr. Conley and Ms. Mills received the same discipline – a Final Written Warning.  [Filing No. 62 at 10.]  It argues that even if Ms. Mills was similarly situated, Davidson Group has presented legitimate, non-discriminatory reasons for disciplining Mr. Conley:  namely, that Mr. Conley did not follow the proper chain of command.  [Filing No. 62 at 11.]

Mr. Conley has not provided evidence that a similarly situated employee outside of his protected class was treated more favorably than he was.  Ms. Mills was disciplined for failing to tell a consultant that a customer had cancelled an appointment, whereas Mr. Conley was disciplined for failing to follow the proper chain of command regarding his issues about unpaid

commission. These two types of conduct are not similar. One involves neglecting to tell a consultant that an appointment was cancelled, while the other involves taking an issue up the incorrect chain of command, through multiple email messages and requests for meetings, and acknowledging that the proper procedure was not being followed. And, in any event, both Mr. Conley and Ms. Mills received the same discipline for the two offenses – Final Written Warnings. [*Cf.* Filing No. 50-3 at 28 (Mr. Conley's Final Written Warning for insubordination) and Filing No. 50-3 at 32 (Ms. Mills' Final Written Warning for failing to inform the design consultant of the appointment cancellation).] The Court finds that Ms. Mills is not a sufficient comparator related to Mr. Conley's race discrimination claim based on discipline for insubordination. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (for prima facie case, plaintiff must show that the two employees "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish…the employer's treatment of them") (quotation, citation, and emphasis omitted).

b.    Discipline for Attendance Issues

Related to his discipline for attendance issues, Davidson Group argues that Mr. Conley had four unexcused absences in a nine-week period, was late for work eleven times, and took an unauthorized extended lunch break. [Filing No. 51 at 17.] Davidson Group also argues that Mr. Conley "offers nothing but speculation" as to whether Ms. Mills was disciplined for attendance issues. [Filing No. 51 at 18.] Davidson Group asserts that although Mr. Conley thought Mr. Still was not receiving attendance points for being barely late to work like Mr. Conley, he "offers no specific information regarding Mr. Still's attendance, and in fact Mr. Still did not have documented attendance issues that warranted disciplinary action under company policy." [Filing No. 51 at 18-19.]

Mr. Conley responds that he worked closely enough with Ms. Mills to know that she was absent so many times during her employment that she should have been terminated, and that both Sommer Hardy, who worked with Mr. Conley in the Confirmation Department at Davidson Group, and Mr. Still confirmed this. [Filing No. 59 at 22-23.] He contends that the fact that Ms. Mills was disciplined and that her attendance then improved "is consistent with the claims of [Mr.] Conley, [Ms.] Hardy and [Mr.] Still that [Davidson Group] failed to discipline [Ms.] Mills and terminate her for excessive absenteeism and Attendance Policy violations that took place during [Mr.] Conley's employment." [Filing No. 59 at 23.] Finally, Mr. Conley argues that Davidson Group "did not argue that its action was supported by a legitimate, nondiscriminatory reason," and that, even if it had, Mr. Conley has presented evidence of pretext. [Filing No. 59 at 24-25.]

Davidson Group replies that even if Ms. Mills is similarly situated, she was not treated more favorably than Mr. Conley. [Filing No. 62 at 11.] Davidson Group argues that the Declarations of Mr. Conley, Ms. Hardy, and Mr. Still are inadmissible as to Ms. Mills's absences because this information is outside of those individuals' knowledge and "[w]hile [they] might know whether Ms. Mills was or was not present in the office on any given day, they have no personal knowledge of the specific dates on which she was absent, the circumstances surrounding her absences, or whether her absences were excused." [Filing No. 62 at 12.] Davidson Group also notes that Mr. Conley conceded in his deposition that he did not know whether Ms. Mills was reprimanded, and that she was in fact disciplined for attendance. [Filing No. 62 at 12.] It argues further that even if Mr. Conley has shown a prima facie case of discrimination, Davidson Group disciplined him for the legitimate, non-discriminatory reason of failing to comply with the Attendance Policy. [Filing No. 62 at 13.]

At the outset, the Court finds that the Declarations of Mr. Conley, Ms. Hardy, and Mr. Still are admissible to show that Ms. Mills was frequently absent from work, but not to show that Ms. Mills' absences necessarily warranted termination. Those individuals worked closely enough with Ms. Mills that they are capable of testifying whether she was frequently absent from work, but they would not have the necessary knowledge to testify regarding the reasons for those absences and whether they were unexcused. Mr. Conley has shown that Ms. Mills was frequently absent, which is enough to create a genuine issue of material fact regarding whether those absences were numerous enough to warrant termination. Moreover, the evidence shows that Mr. Conley received a Final Written Warning for his attendance issues, [Filing No. 50-3 at 29 (for accrual of 7.25 attendance points)], while Ms. Mills received only a Verbal Warning, [Filing No. 50-3 at 31 (for accrual of 3.25 attendance points).] This evidence is sufficient to support a prima facie case of race discrimination. Finally, Mr. Conley testified that Mr. Still was frequently late coming back from breaks and "wasn't getting pointed at the rate that [Mr. Conley] was getting pointed." [Filing No. 50-1 at 35.] Although Ms. Wright stated in her Declaration that Mr. Still did receive points for attendance violations, but not enough to warrant a documented warning, Mr. Conley has shown that there is a genuine issue of fact regarding whether Mr. Still received points for the same conduct for which Mr. Conley did.

Davidson Group argues that it disciplined Mr. Conley for attendance issues for legitimate, non-discriminatory reasons: that during a nine-week period he had four unexcused absences, was late for work eleven times, and took an unauthorized lunch break. But Mr. Conley avers that Ms. Wright began disciplining him for extremely minor tardies, including being one minute late, and that she had not previously done so. This, coupled with evidence of Ms. Mills' frequent absences and lighter discipline, is enough to raise a genuine issue of material fact regarding whether

Davidson Group was singling Mr. Conley out for discipline related to attendance issues, which would support the conclusion that the proffered reasons for disciplining him were pretextual.

The Court notes, however, that Mr. Conley's race discrimination claims related to his discipline for attendance issues suffer from a fatal flaw not addressed by the parties. The Court's research reveals that simply receiving written discipline does not constitute an adverse employment action – a necessary element of a race discrimination claim. *See, e.g.*, *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 789 (7th Cir. 2019) (written warning for unauthorized overtime "had no impact on [plaintiff's] pay or on any terms or conditions of employment, so…was not an adverse employment action"); *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) ("written reprimands without any changes in the terms or conditions of…employment are not adverse employment actions"). Mr. Conley does not contend that his discipline for attendance issues somehow led to his termination, and the evidence indicates that he was terminated because Davidson Group filled his position – as it warned Mr. Conley it might while he was on leave. Indeed, he does not identify any consequences of his written discipline for attendance issues.

As a general matter, the Court is not in the business of crafting and developing new arguments for parties. *Horne v. Electric Eel Mfg. Co.*, 987 F.3d 704, 727 (7th Cir. 2021) ("[U]nder the principle of party presentation, courts generally do not craft new arguments for a party, especially in civil cases and especially when the party is represented by counsel"). However, in a case like this, where a favorable, dispositive, and seemingly clear issue of law is left entirely untouched by a party, the Court is inclined to intervene. Federal Rule of Civil Procedure 56(f)(2) allows the Court to grant a summary judgment motion on grounds not raised by the movant, provided that the party against whom summary judgment will be entered is afforded notice and a reasonable time to respond. Accordingly, pursuant to Fed. R. Civ. P. 56(f)(2), the Court gives the

parties notice of its intent to grant Davidson Group's Motion for Summary Judgment as to Mr. Conley's race discrimination claims related to discipline for attendance issues because Mr. Conley did not suffer an adverse employment action related to that discipline. Mr. Conley shall have through **April 30, 2021** in which to respond and show cause why Davidson Group's Motion for Summary Judgment should not be granted as to those claims.

In sum, the Court **GRANTS** Davidson Group's Motion for Summary Judgment on Mr. Conley's race discrimination claims related to discipline for insubordination, but **DENIES** the motion on Mr. Conley's race discrimination claims related to discipline for attendance issues at this time. Mr. Conley must show cause by **April 30, 2021** why the Court should not enter summary judgment for Davidson Group on his race discrimination claims related to discipline for attendance issues.

### 5.   *Termination*

Davidson Group argues in support of its Motion for Summary Judgment that Mr. Conley has not presented evidence of a similarly situated employee who took a personal leave of absence and was not terminated due to his or her position being filled. [Filing No. 51 at 19.] It also points to the Employee Handbook, which states that "Return to work from a personal leave is not guaranteed, but rather is on a position available basis," and notes that Mr. Conley was warned when he requested his leave of absence that his position might be filled while he was gone. [Filing No. 51 at 19-20.]

In response, Mr. Conley argues that "because [he] was terminated while he was on approved leave of absence and replaced with a Caucasian employee, who the evidence shows was not as strong an employee as [Mr.] Conley…, a reasonable factfinder could conclude that [he] was terminated because of his race." [Filing No. 59 at 33.]

In reply, Davidson Group argues that Mr. Conley did not respond to its arguments regarding his failure to present a prima facie case of race discrimination. [Filing No. 62 at 13-15.]

Mr. Conley has not presented a prima facie case of race discrimination related to his termination because he has not identified a similarly situated comparator. Indeed, he does not even attempt to do so, arguing only that his Caucasian replacement generated less sales than he did. Further, apart from whether his replacement was a comparator, Mr. Conley has not called into question Davidson Group's reason for terminating him (that it filled his position while he was on leave) by presenting evidence that his termination was related to his race. To the contrary, Davidson Group informed Mr. Conley when he requested his personal leave of absence that his position might be filled while he was gone, and Mr. Conley acknowledged this possibility. Mr. Conley went ahead with his leave, despite this risk. The fact that this possibility became a reality, and that Mr. Conley is a member of a protected class, is not enough to support his race discrimination claim, and the Court **GRANTS** Davidson Group's Motion for Summary Judgment on that claim.

### B.    Retaliation Claim

Davidson Group argues in support of its Motion for Summary Judgment that Mr. Conley cannot establish that he engaged in any protected activity by complaining about race discrimination to the company, because he did not do so. [Filing No. 51 at 21.] It notes that evidence that Mr. Conley told two employees in Ohio that he thought the data deletions were because of his race is not relevant because those employees were not in management at the time of his complaints, "were not involved in any decisions relating to Mr. Conley's employment, and they otherwise did not influence the actual decision makers in any manner." [Filing No. 51 at 22.] It argues that, even if

Mr. Conley had established a prima facie case, Davidson Group made each of its decisions based on legitimate, non-discriminatory reasons. [Filing No. 51 at 22.]

In response, Mr. Conley argues that his attempts to meet with Ms. Wright and Mr. Woodward regarding the data deletions and his complaints "reasonably can be construed as complaints of employment discrimination or potential employment discrimination." [Filing No. 59 at 34-35.]

In its reply, Davidson Group argues that Mr. Conley needed to put it on notice of his allegation of race discrimination, and that merely intending to complain about race discrimination is not sufficient. [Filing No. 62 at 17-18.]

To survive summary judgment on his Title VII retaliation claim, Mr. Conley must present evidence showing that "he suffered a materially adverse action because [he] engaged in protected activity." *Lloyd*, 761 Fed. App'x at 612 (quotation and citation omitted). The question is "whether the evidence produced would permit a reasonable factfinder to conclude [Mr. Conley's race] caused the [adverse action]." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018).

Mr. Conley's Title VII retaliation claim is fatally flawed because he has not shown that he engaged in protected activity. His only attempt at doing so is his assertion that he tried to meet with Ms. Wright and Mr. Woodward, and that his complaints could reasonably be construed as being about race discrimination. But Davidson Group is not required to read Mr. Conley's mind. It is undisputed that he never complained regarding race discrimination, so his Title VII retaliation claim fails as a matter of law and the Court **GRANTS** Davidson Group's Motion for Summary Judgment on that claim.

# IV.
## CONCLUSION

While Mr. Conley may feel that he was not treated fairly at Davidson Group in connection with changes to the commission plan, the loss of commission-related data, discipline for insubordination, and his termination, he has failed to connect any of that treatment to his race. *See Cole v. Bd. of Trustees of Northern Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016) ("Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus"); *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) ("[N]ot everything that makes an employee unhappy is an actionable adverse action"). Mr. Conley has, however, presented enough evidence to create a genuine issue of material fact regarding whether Davidson Group treated him less favorably based on his race in connection with its discipline of him for attendance issues. For the reasons discussed above, the Court **GRANTS IN PART** Davidson Group's Motion for Summary Judgment, [49], as to Mr. Conley's Title VII and § 1981 race discrimination claims based on changes to the commission plan, the deletion of data, discipline for insubordination, and Mr. Conley's termination, and as to Mr. Conley's Title VII retaliation claim, but **DENIES IN PART** Davidson Group's Motion for Summary Judgment, [49], as to Mr. Conley's Title VII and § 1981 race discrimination claims based on discipline for attendance issues at this time. Mr. Conley must show cause by **April 30, 2021** why the Court should not enter summary judgment for Davidson Group on that claim as well, because Mr. Conley did not suffer an adverse employment action related to discipline for attendance issues.

Date: 4/13/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

38

**Distribution via ECF only to all counsel of record**